UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN RE:

**DISCOUNT CIGARETTE, CIGARS, ETC., INC.**     CASE NO. **04-12903**

DEBTOR                                          CHAPTER 7


**DISCOUNT CIGARETTE, CIGARS, ETC., INC.**     ADV. NO.

PLAINTIFF                                       **05-1016**

V.

**FRANKLIN SUPPLY, INC.**

DEFENDANT

### MEMORANDUM OPINION

### Introduction

Discount Cigarette, Cigars, Etc., Inc. ("Discount") sued Franklin Supply, Inc.

("Franklin") for claims stemming from a dispute that preceded its September 4, 2004

chapter 11 filing.  Discount's scatter-shot complaint sought damages for breach of

contract, defamation, malicious prosecution, abuse of right, civil conversion by proxy,

negligent misrepresentation and fraud.  Discount's trustee continued to prosecute the suit

after the case was converted to a chapter 7 liquidation.[1]

Discount and Franklin consented to the bankruptcy court's rendering final

judgment.[2]  This memorandum opinion comprises findings of fact and conclusions of law

---

[1]  Order Converting Case under Chapter 11 to Case under Chapter 7, P-47 in case No. 04-12903.  This
memorandum opinion refers to Discount as the plaintiff even though the chapter 7 trustee became the real
party in interest on his appointment.  *See* 11 U.S.C. §323.

[2]  The April 4, 2006 scheduling order recited that this lawsuit was not a core proceeding, and as a result the
court would issue proposed findings and conclusions for the district court's review.  However, at trial the

pursuant to Fed. R. Civ. P. 52(a)(1), made applicable by Federal Rule of Bankruptcy

Procedure 7052.[3]

## Facts

### 1.  *Discount's Origins*

Discount opened a store to sell tobacco products, hookahs[4] and related supplies

near Louisiana State University in Baton Rouge in November 2003.  Talal Solieman[5]

managed the business "from A to Z."  His father, Abdullah "Mike" Solieman,[6] owned a

Pride, Louisiana convenience store using the trade name Market Plus.  Mike Solieman

advanced funds through his own company, Solieman, Inc., to enable Discount to make

deposits for its premises[7] and to buy its start-up inventory.

### 2.  *The Dispute Concerning the Franklin Supply Order*

Mike Solieman recommended that Talal "shop around" to find a wholesaler from

which Talal could buy inventory on advantageous terms using the funds Solieman, Inc.

---

parties agreed to the bankruptcy court's rendering of a final judgment.  Transcript of March 31, 2008 trial, p. 4 (P-130).

[3]  The trial followed extensive motion practice and an appeal to the district court in the consolidated adversary proceeding (*Discount Cigarette v. State of Louisiana Department of Revenue*, Adv. No. 05-1021) from which this lawsuit later was deconsolidated.

[4]  A hookah is a smoking device sometimes also referred to as a water pipe.

[5]  Osama "Sam" Solomon testified by video deposition.  Sam, Talal's brother and a part-time graduate student at Louisiana State University, was Discount's sole stockholder then, though he had little knowledge of the enterprise.  Sam Solomon changed the spelling of his surname from *Solieman* to *Solomon* when he became a United States citizen.

[6]  Mike Solieman taught literature in Kuwait and Jordan before coming to the United States in 1988.  He was involved with several retail establishments and restaurants before buying the store in Pride, from which he sold cigarettes, liquor, beer and groceries.

[7]  Exhibit Trustee 2-D comprised copies of cashier's checks that Mike Solieman testified were loans from Solieman, Inc. to Discount to secure and make tenant improvements to its three leased locations.

had advanced.[8]  Mike Solieman insisted that Talal not buy more than $50,000 of inventory at one time because Mike Solieman kept no more than that in the safe at his Pride store, so it effectively limited the "working capital" to which he could give Discount access.[9]

Talal decided to approach Franklin, a licensed tobacco wholesaler, to negotiate favorable terms for tobacco inventory.  He first visited Franklin's offices in Franklin, Louisiana around February 6, 2004.  During that visit Talal, introducing himself as Sam,[10] completed a Franklin Supply credit application and signed a personal guaranty for the debt on behalf of Sam, whose power of attorney he held.[11]  Talal bought $6,682.68 of tobacco products for Discount on that visit.[12]

Shortly after the first purchase, Talal[13] negotiated a larger cigarette order with Franklin Supply by telephone.[14]  Franklin's sales manager, Jerry D. Theriot (sometimes referred to as "J.D.") and Talal[15] reached an agreement to sell Discount $94,091.50 in

---

[8]   Mike Solieman testified that in his experience Louisiana tobacco wholesalers will accept a retailer's checks only after they have dealt with the retailer for between three and six months.

[9]   Transcript of April 1, 2008 trial, p. 225, ll. 2-10.

[10]   Talal, like his brother, testified by video deposition.  His reasons for introducing himself as his brother Sam were not made part of the record.

[11]   Franklin Supply Credit Application (Exhibit Trustee 9-B); power of attorney from Sam Solomon to Talal Solieman (Exhibit Trustee 5).

[12]   February 6, 2004 Franklin Supply invoice (Exhibit Trustee 9-A).

[13]   Talal continued to identify himself as his brother Sam in these calls to Franklin.  His reasons for doing so were not made part of the record.

[14]   Though Talal believed that larger purchases enabled Discount to obtain more favorable wholesale tobacco prices, Theriot testified that Discount obtained no price advantage by placing a larger order.

[15]   Sam admitted on both direct and cross-examination that he did not know the terms of the sale.  Talal corroborated this.  Transcript of Talal Solieman Video Deposition, p. 260, ll. 17-25, p. 261, ll.1-3.

tobacco products, comprising 3680 cartons of cigarettes.  The total Discount agreed to

pay for the shipment is the only aspect of the transaction that was not disputed.

Theriot testified that he spoke with Talal by telephone several times on February

9 and 10, 2004.  According to Theriot, Talal (identifying himself as Sam) agreed to pay

for the inventory when it was delivered to Discount's store near LSU.[16]  He said that Talal

never asked whether Discount could buy the merchandise on credit.  According to

Theriot, Franklin does not allow new customers to buy on credit, and instead insists that

new customers pay cash on delivery of merchandise unless Franklin has approved their

credit applications beforehand.[17]

Keith Landine, Franklin's president, also testified that Discount agreed to pay cash

upon delivery of the order.  In fact, Landine said that he told Talal (identifying himself as

Sam) that because Discount would be paying for the large order with a substantial

quantity of cash, Franklin planned to send Theriot to meet the delivery truck at Discount's

store.  Theriot would collect the payment and deposit the money in a Baton Rouge branch

of Franklin's bank.

Talal's testimony was completely inconsistent with Theriot's and Landine's.  He

claimed that he'd never understood that the order was to be a C.O.D. transaction and

insisted that Franklin agreed to deliver the merchandise and give Discount time to pay for

it.  However, Talal's testimony on the specific terms of the agreement varied.  On cross-

examination by Franklin's attorney he testified first that Franklin agreed to give Discount

---

[16]   The invoice for the February 17 delivery in fact states that the shipment was "C.O.D."  February 16,
2004 Franklin Supply invoice (Exhibit Trustee 10).

[17]   Keith Landine testified that he had no knowledge that Franklin ever approved credit terms for Discount.
Discount did not offer any convincing evidence that contradicted Landine's testimony on that point.

seven, fourteen or as many as 21 days to pay for the order.[18]  Later in the cross-

examination, Talal testified that he'd intended to pay Franklin at least one-half to two-

thirds of the amount owed within 7 days.[19]  Talal eventually admitted that he really could

not remember the specific sale terms to which he'd agreed.[20]

### 3.  Discount Does Not Pay Franklin for the Delivery and the Same Day Removes Inventory from its Premises

Franklin employees delivered the cigarettes to Discount's Baton Rouge store on

February 17, 2004.  When Franklin's driver asked Talal to pay for the delivery, Talal

claimed that Franklin had agreed that Discount could pay later.  Franklin's driver

consulted his supervisor by telephone and before leaving Baton Rouge had Talal sign a

delivery ticket that the driver had annotated "J.D. will pick up."[21]

Theriot drove to Baton Rouge later that day to collect from Discount.  Theriot

testified that he'd spoken to Talal by telephone both before and after Franklin's truck

delivered the cigarettes and that Talal assured him that he would meet Theriot with the

payment.  However, the business was closed when Theriot arrived at the store early that

afternoon.  A clerk who later opened the business told Theriot she did not know "Sam's"

whereabouts.  Learning this, Theriot telephoned "Sam" (not aware that throughout the

ordering process he had been dealing only with Talal), who told him he'd had to leave for

New Orleans where his mother had been hospitalized.[22]  Talal initially promised to return

---

[18]   Transcript of Talal Solieman Video Deposition, p. 220, ll. 19-20.

[19]   Transcript of Talal Solieman Video Deposition, p. 227, ll. 16-25; p. 228, ll. 1-3.

[20]   Transcript of Talal Solieman Video Deposition, p. 236, ll. 12-21.

[21]   February 16, 2004 Franklin Supply invoice (Exhibit Trustee 10).  Invoice contains handwritten notes.

[22]   Talal claimed to have driven to his father's store in Pride after the delivery, but his father testified that his son did not come to the Pride store that day.

to Baton Rouge later that night with the payment, but in a later call agreed instead to be at

Franklin's office early the next morning with the money.  With that understanding,

Landine told Theriot he could leave for home.

Before Theriot left he counted the product Franklin delivered that remained in

Discount's store, and concluded that perhaps only a third of the inventory Franklin had

delivered earlier that day was still on the premises.[23]  In fact, no party disputes that

Discount's principals had removed some of its cigarette inventory from the premises

between the time of the Franklin delivery and Theriot's arrival.  The evidence established

that on the day of the delivery, Talal with his brother in law's help rented a storage unit[24]

and moved cigarettes into it.[25]

### 4.    *Franklin Supply Initiates a Criminal Proceeding*

Mr. Landine, Franklin's president, did not direct the delivery truck to return to

Discount's premises to recover the remaining cigarettes, concluding that "we knew we

were getting ripped off" when Discount failed to pay on delivery,[26] and Franklin briefly

treated the transaction as a sale.  Thus Franklin sent Discount a February 19, 2004 letter

demanding payment for the February 17 delivery.  However, the very next day –

---

[23]  Baton Rouge police officers were summoned to Discount's store while Theriot waited.  Theriot recalled telling the responding officers that the situation was being worked out, and they left shortly after without taking any formal action.

[24]  February 17, 2004 rental agreement (Exhibit T-12).

[25]  Talal insisted on redirect that he did not move any of the Franklin Supply inventory on February 17, 2004, and instead waited until the next day to do so.  Transcript of Talal Solieman Video Deposition, p. 261, ll. 9-25, p. 262, ll. 1-25, p. 263, ll. 1-5.  Talal implied in earlier testimony that he'd moved the cigarettes to the storage unit for safekeeping because the store had been burglarized in December 2003 and in early February 2004.  Transcript of Talal Solieman Video Deposition, p. 73, ll. 12-25, p. 76, ll. 22-25, p. 77, ll. 1-8.  Sam Solomon also testified that "we put [the cigarettes] in storage because we were afraid, you know, the store was going to get robbed."  Transcript of Sam Solomon video deposition, p. 31, ll.10-12.

[26]  Transcript of April 29, 2008 trial, p. 634, ll. 20-23.

February 20, 2004 – Franklin made a complaint to St. Mary Parish law enforcement authorities that led to a warrant for Sam Solomon's arrest on theft charges.[27]

On February 20, 2004, the Louisiana Office of Alcohol and Tobacco Control ("OATC")[28] began its investigation of Franklin's February 17 delivery to Discount. On the basis of Keith Landine's complaint, OATC treated the incident as a theft and eventually caused the arrests of Sam Solomon, Talal and their brother-in-law, Salah Abu-Sarwish. None of the arrests culminated in convictions on charges relating to Franklin Supply.[29]

The OATC obtained a search warrant for the storage unit and recovered part of the cigarette shipment, which it later turned over to Franklin.

Talal testified that after the arrests he tried to restart Discount's business at a different location but was unable to buy any inventory. Eventually the company filed a

---

[27]   No evidence established that Franklin reported the events surrounding the February 17 delivery to the Baton Rouge Police Department as a theft. Moreover, the trial evidence relating to the way Franklin came to involve law enforcement authorities in the dispute was notably incomplete. For example, the only evidence relevant to law enforcement agencies' involvement was the testimony and report of Office of Alcohol and Tobacco Control Agent Ernest Green (Exhibit Trustee 15). No one ever introduced into evidence the arrest warrant for Sam Solomon.

[28]   The Louisiana OATC is responsible for investigating applications for permits to sell tobacco products and investigating violations of state laws governing tobacco product sales. La. R.S. 26:901 *et seq.* The OATC commissioner is authorized to impose fines and civil penalties including suspension and revocation of permits, for violations of laws regarding the sale of tobacco products. La. R.S. 26:918. OATC agents possess the "same authority and powers conferred by law upon law enforcement officers of this state." La. R.S. 26:796.

[29]   According to Joseph Scott, Sam Solomon's criminal defense attorney, the state court dismissed all charges associated with Franklin's complaint after a conference among counsel and Judge Todd Hernandez of the 19th Judicial District Court for East Baton Rouge Parish. Scott testified that at the conference he pointed out that Franklin had made its criminal complaint on February 20, 2004, the day after its February 19, 2004 demand letter. Scott therefore argued that the criminal charges were an "improper use of law enforcement to enforce a civil debt . . . ." Transcript of April 29, 2008 trial, p. 605, ll. 3-25, p. 606, ll. 1-3, p. 608, ll. 6-13.

chapter 11 petition.  The court converted its case to a chapter 7 liquidation in April 2005

on motion of the United States Trustee.[30]

### Analysis[31]

*1.      Breach of Contract*

The evidence supports a finding that Discount agreed to pay Franklin cash for the

cigarettes when they were delivered.  No credible evidence supports a finding that

Franklin agreed to sell the cigarettes to Discount on credit or be paid on terms other than

in cash in full upon delivery.

Discount's version of events rests principally on Talal's testimony regarding the

proposed terms of the transfer.  At one point on cross-examination he testified that

Franklin agreed to let Discount pay between seven and fourteen days after delivery, and

perhaps even as many as 21 days later.[32]  Later he claimed that the agreement was to pay

within 7 to 14 days, at the same time admitting he intended to pay for some of the order

no less than 7 days after February 17, 2004.[33]  These inconsistencies regarding the most

crucial term of the sale deprive Talal's testimony regarding the sale of all credibility.

Other evidence casts doubt on Talal's version of events.  Specifically, Talal

ignored his father's advice and placed an order with Franklin for more than $94,000 in

tobacco products knowing that Discount lacked the money to pay for them upon

---

[30]   *See* footnote 1, above.

[31]   The trustee has conceded that he cannot prove the malicious prosecution claim, which therefore is
abandoned.  Trustee's Reply Brief, pp. 9-10 (P-208).

[32]   *See* footnote 19, above.

[33]   *See* footnote 20, above.

delivery.[34]  Talal then decided to remove some of the recently delivered inventory to a

storage space rented the same day as the Franklin delivery.[35]  He also decided to leave

Discount's premises on February 17 to avoid facing Theriot after repeatedly assuring him

he would have a payment for the delivery that day.  He then failed to travel to Franklin's

offices with the payment the next day.   These actions in combination betray Talal's – and

Discount's – lack of intent to perform the contract by paying cash on delivery, and

undermine the plausibility of Talal's testimony.

Because Discount, not Franklin, breached the contract, the trustee has no claim

against Franklin for breach.

### 2.	Defamation

The trustee alleges that Franklin defamed Discount by falsely accusing its owners

and agents, Sam, Talal and their brother-in-law, of committing criminal acts.  Franklin

counters that even if its communications to law enforcement and other agencies were

defamatory, they were privileged and are not actionable.

The tort of defamation is the invasion of a person's interest in his reputation and

good name.  *Costello v. Hardy*, 864 So.2d 129, 12 (La. 2002), citing *Fitzgerald v. Tucker,*

737 So.2d 706, 715 (La. 1999); *Trentecosta v. Beck,* 703 So.2d 552, 559 (La. 1997);

*Sassone v. Elder,* 626 So.2d 345, 350 (La. 1993).  "Four elements are necessary to

establish a defamation cause of action: (1) a false and defamatory statement concerning

another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater)

---

[34]   Mike Solieman learned only *after* Franklin made the delivery that Talal had bought substantially more than $50,000 from Franklin Supply.  Talal had never even asked his father for the $50,000.  Transcript of April 1, 2008 trial, p. 260, ll. 21-25 and p. 261, ll. 1-12.

[35]   Talal's claim that he rented the storage space and moved the cigarettes solely as a precaution against theft is implausible because Talal only asked his brother-in-law to rent the space *after* the delivery.  The evidence supports a finding that Talal intentionally sought to place the inventory beyond Franklin's reach.

on the part of the publisher; and (4) resulting injury." *Trentacosta*, 703 So.2d at 559,

citing RESTATEMENT (SECOND) OF TORTS § 558 (1977). To prevail on a

defamation claim, the plaintiff must prove "that the defendant, with actual malice or other

fault, published a false statement with defamatory words which caused plaintiff

damages." *Sassone*, 626 So.2d at 350. Failure to prove a required element will defeat a

cause of action for defamation. *Douglas v. Thomas,* 728 So.2d 560, 562 (La. App. 2d

Cir.), *writ denied,* 741 So.2d 661 (1999); *Kosmitis v. Bailey,* 685 So.2d 1177, 1180 (La.

App. 2d Cir. 1996).

"Words which expressly or implicitly accuse another of criminal conduct, or

which by their very nature tend to injure one's personal or professional reputation, even

without considering extrinsic facts or surrounding circumstances, are considered

defamatory per se." *Costello*, 864 So.2d at 140, citing *Kosmitis,* 685 So.2d at 1180;

*Lemeshewsky v. Dumaine,* 464 So.2d 973, 975 (La. App. 4th Cir. 1985); 12

CRAWFORD, LOUISIANA CIVIL LAW TREATISE: TORT LAW § 17.8 at 315.

Malice and falsity are presumed if the plaintiff proves the publication of words that are

defamatory *per se*, and the burden then shifts to the defendant to rebut the presumption.

*Costello*, 864 So.2d at 140, citing *Kosmitis,* 685 So.2d at 1180.

Under Louisiana law, privilege is a defense to a cause of action for defamation.

*Costello*, 864 So.2d at 141. "Louisiana courts have . . . recognized that the public has an

interest in possible criminal activity being brought to the attention of the proper

authorities, and have extended a qualified privilege to remarks made in good faith."

*Kennedy v. Sheriff of East Baton Rouge*, 935 So.2d 669, 683 (La. 2006). However, "the

existence of a qualified privilege is an affirmative defense" and must be specifically pled.

*Costello*, 864 So.2d at 142, fn. 13 (citations omitted.)  Accordingly, the court will not

consider Franklin's affirmative defense of privilege because its answer did not

specifically plead it.

That conclusion does not carry the day for the trustee, who had the burden of

proving that Franklin defamed Discount itself, rather than its principals.  He failed to do

so because the evidence did not establish that Discount had developed a business

reputation in the few months it operated before its dispute with Franklin and necessarily

could not have proven any injury to its reputation, an element of the tort of defamation.[36]

*Bell v. Rogers*, 698 So.2d 749, 755 (La. App. 2d Cir. 1997).

Because the trustee did not prove that Discount's reputation sustained any injury

as a result of Franklin's actions, he has not established a defamation claim against

Franklin.

*3.      Abuse of Rights*

The abuse of rights doctrine imposes "fault" on a party who attempts to exercise a

legal right with the intention of harming or imposing a detriment upon another.  *Lambert*

*v. Maryland Cas. Co.,* 403 So.2d 739, 755 (La. App. 4th Cir. 1981), *aff'd,* 418 So.2d 553

(La. 1982).  To cast a party "in damages for exercising a right legally conferred upon him

there must exist (1) no benefit to the person exercising the legal right and (2) damage or

injury to the person against whom the legal right is asserted."  *Id.* at 757.  If a party has a

"legitimate and serious interest" in the exercise of the right, then the injured person

---

[36]   This assumes that under Louisiana law corporations can even make a claim for defamation, though
some Louisiana courts have concluded without extensive analysis that business corporations may assert
those claims.  *See e.g. Economy Carpets Manufacturers & Distributors, Inc. v. Better Business Bureau of
Baton Rouge,* 361 So.2d 234, 242 (La. App. 1st Cir. 1978); *WHC, Inc. v. Tri-State Road Boring, Inc.,* 468
So.2d 764, 768 (La. App. 1st Cir. 1985).

cannot recover under a theory of abuse of rights. *Id.  See also Illinois Cent. R. Co. v.
International Harvester,* 368 So.2d 1009, 1014 (La. 1979) (holder of a right must show
"at least a 'serious and legitimate interest' . . . in order to justify the exercise of its right"
(internal citation omitted)); *Morse v. J. Ray McDermott of La., Inc.,* 344 So.2d 1353,
1369 (La. 1977) ("The exercise of a right . . . without legitimate and serious interest, even
where there is neither alleged nor proved an intent to harm, constitutes an abuse of
right . . . .")

Franklin had a legitimate and serious interest in either payment for or recovery of
the products it sold Discount.  It held a vendor's privilege against the tobacco products to
secure the purchase price.  La. Civil Code art. 3227.  Exercising that right would have
furthered its interest in being paid for the tobacco products it delivered to Discount.
Thus, the abuse of rights theory is inapplicable, and Discount does not have a claim
against Franklin under that theory.

### 4.      *Civil Conversion by Proxy*

Louisiana appellate courts have considered conversion and wrongful or illegal
seizure[37] as complementary theories of recovery for the improper taking of another's
movable property.  *See e.g. Dixie Savings & Loan Assoc. v. Pitre*, 751 So.2d 911 (La.
App. 5th Cir. 1999) (causes of action for wrongful seizure and conversion found on the

---

[37]   Discount's complaint did not specifically allege a claim for wrongful or illegal seizure.  However, count
VIII did allege that Franklin intentionally caused the OATC to seize the cigarettes by misrepresenting facts
and withholding information.  Federal Rule of Bankruptcy Procedure 7015(b) allows the amendment of
pleadings to conform to the evidence if parties at trial raise by express or implied consent issues that the
original pleadings did not raise.  *See Matter of Beauboeuf*, 966 F.2d 174, 177 (5th Cir. 1992) (citations
omitted) (implying consent of parties to trial of issues not raised in the pleadings where the parties had a
"fair opportunity to defend" with respect to the amended issues and where parties had an opportunity to
present additional evidence on the amended issues).  This case has been pending since early 2005 and was
tried over four days.  The parties had ample time to frame the issues properly and present relevant evidence
on all the issues.  The evidence thus amended the trustee's complaint to include a cause of action for
wrongful seizure.

same set of facts); *Echo, Inc. v. Power Equipment Distributors, Inc.*, 719 So.2d 79 (La.

App. 1st Cir. 1998) (considering adequacy of damages for wrongful seizure and

conversion for misappropriation of inventory).

The tort of conversion is the unlawful interference with the ownership or

possession of a movable.  It requires: (1) acquisition of possession in an unauthorized

manner; (2) removal of a chattel from one place to another with the intent to exercise

control over it; (3) unauthorized transfer of possession of the chattel; (4) withholding

possession from the owner; (5) alteration or destruction of the chattel; (6) improper use of

the chattel; or (7) assertion of ownership over the chattel.  *Joyner v. Liprie*, 983 So.2d

257, 262 (La. App. 2d Cir. 2008), citing *Dual Drilling Co. v. Mills Equipment

Investments, Inc.*, 721 So.2d 853 (La. 1998).

A creditor bypassing judicial process to recover possession of goods from a

defaulting purchaser can only avoid liability for wrongful seizure by proving that the

owner consented to the creditor's actions.  *Echo, Inc.*, 719 So.2d at 99.  A purchaser's

default in payment does not justify repossession by the defendant's agent without resort to

proper legal process unless the purchaser consents to the method of repossession.  *Id*.

Accordingly, a party that may have superior rights to disputed property cannot employ

extra-judicial remedies and plead the possessor's non-ownership as a defense to a claim

based on the use of those remedies.  *Central Fidelity Bank v. Gray*, 422 So.2d 670, 672

(La. App. 3d Cir. 1982).

The evidence in this case supports Discount's claim for both conversion and

wrongful seizure.  Franklin's personnel made a complaint to criminal law enforcement

authorities that led to issuance of an arrest warrant for Discount personnel.  The

complaint eventually led the OATC to seize cigarettes from the debtor. Franklin was

entitled to payment or to use remedies in the Louisiana Code of Civil Procedure to

recover the inventory. *See* La. Code Civ. P. arts. 3541, 3542, 3543 and 3544

(prejudgment writs of attachment and sequestration). Instead, Franklin impermissibly

resorted to the criminal law and employment of investigative and law enforcement

agencies to recover the cigarettes.

Franklin argues that it is not liable for conversion because OATC agents actually

recovered the cigarettes. It contends that "[o]ne is not liable for a conversion by another

person where he did not direct, advise, participate in, or benefit from it, and he does not

bear such a relationship to the latter person as would make him responsible for his act,"

*Lincecum v. Smith*, 287 So.2d 625, 628-9 (La. App. 3d Cir. 1974). However, Franklin

did actually participate in and benefit from the conversion because J. D. Theriot and a

Franklin driver retrieved the seized cigarettes from the OATC's office.

Franklin's criminal complaint to St. Mary Parish law enforcement authorities led

to an arrest warrant for Discount personnel, the involvement of the OATC and recovery

of the inventory. Franklin's participation in that effort renders it liable for conversion and

wrongful seizure.

### 5.     *Negligent Misrepresentation*

The complaint alleged that Franklin is liable because its misrepresentation of the

terms of its agreement with Discount caused the OATC and law enforcement agencies to

seize the cigarettes.

The tort of negligent misrepresentation rests on one party's failure to provide

correct information about existing facts to another party. *Ethyl Corp. v. GulfStates*

*Utilities, Inc.*, 836 So.2d 172, 178 (La. App. 1st Cir. 2002).  A plaintiff alleging negligent

misrepresentation must prove that the defendant owed a duty of care to the plaintiff, the

defendant breached that duty, the risk of harm fell within the scope of protection afforded

by the duty, and defendant's misrepresentation was a cause-in-fact of the resulting harm.

*Id*.

The trustee did not establish a negligent misrepresentation claim against Franklin

because no evidence established that Franklin owed Discount a duty of care, and in any

case Franklin did not make any alleged misrepresentation to Discount.  *See Cameron*

*Parish School Board v. State Farm Fire and Casualty Co.*, 560 F.Supp.2d 485, 489

(W.D. La. 2008), citing *Commercial National Bank in Shreveport v. Audubon Meadow*

*Partnership*, 566 So.2d 1136 (La. App. 2d Cir. 1990) (plaintiff must allege that *it* was

given incorrect information to prevail on negligent misrepresentation theory) (emphasis

added).

6.      *Fraud*

Discount's complaint alleged that Franklin intentionally misrepresented the terms

of its agreement with Discount to secure the assistance of law enforcement agencies in

recovering the cigarettes.  It also claimed that Franklin's reports to the agencies were

fraudulent.

Louisiana Civil Code article 1953 defines *fraud* as:

> [A] misrepresentation or a suppression of the truth made with the
> intention either to obtain an unjust advantage for one party or to cause a loss
> or inconvenience to the other.  Fraud may also result from silence or inaction.

La. Civ. Code art. 1953.  The essential elements of a fraud claim are the intent to defraud

or gain an unfair advantage, actual or potential loss or damage, and an element that courts

have labeled "reliance, inducement or causation." *Sun Drilling Products Corp. v.*

*Rayborn*, 798 So.2d 1141, 1152-53 (La. App. 4th Cir. 2001).

A cause of action for fraud rests on the *plaintiff's* showing that "had he known the

truth, he would not have acted as he did to his detriment." *Sun Drilling Products Corp.* at

1153 (emphasis added). The trustee's claim is based on *Franklin's* alleged

misrepresentations to the OATC regarding the parties' agreement, and not on the

defendant's misrepresentations to *Discount*. Because no evidence supported a finding

that Franklin fraudulently misrepresented anything to Discount, the trustee has not proven

a fraud claim.

### 7.    *Damages*

#### a.    *Damages for Wrongful Seizure*

Louisiana law allows a party aggrieved by a wrongful seizure to recover special

damages and also general damages for embarrassment, humiliation, mental anguish and

inconvenience caused by the tortfeasor's intentional violation of property rights. *See*

*Mid-State Homes, Inc. v. Lartigue*, 383 So.2d 99, 100 (La. App. 3d Cir. 1980); *May Co.,*

*Inc. v. Heirs of Sumage*, 347 So.2d 916, 918 (La. App. 3d Cir. 1980). Discount seeks

both, though the evidence established its entitlement to only limited relief.

#### i.    *The Trustee Did Not Establish that Discount Lost Profits*

The evidence did not support a finding that the seizure caused Discount to lose

any profits justifying an award of special damages. Central to this finding and conclusion

is the absence of documents that corroborate the plaintiff's witnesses' testimony or

support the conclusions of its expert.

Talal testified that Discount sold cigarettes from the Nicholson Drive location

from some date in November 2003 until February 2004.[38]  However, OATC Agent David

Gautreaux, a certified public accountant who was investigating Discount's finances

sometime before February 17, 2004, stated that the company did not even have a retail

tobacco sales permit until December 2003.[39]  He also testified that he found no evidence

that Discount had made any wholesale tobacco purchases until January 5, 2004.[40]  Thus

Discount had no tobacco inventory and could not have made any lawful retail sales of

tobacco products before January 5, 2004 – only about six weeks before the seizure.[41]

This finding is corroborated by the lack of any monthly sales tax records as of the date of

Agent Gautreaux's investigation.[42]

The trustee invites the conclusion that Discount could project its lost profits

accurately notwithstanding the debtor's lack of inventory.  However, the record contains

no evidence from which the finder of fact can determine whether Discount ever earned a

profit or could have earned a profit had the OATC not seized the inventory.  For example,

---

[38]   Discount had leased space for two additional stores on Jones Creek Road in Baton Rouge and at Ultima
Plaza in Prairieville in October and November 2003.  Mark Hebert, leasing agent for the two properties,
testified that the premises were never occupied, except for the installation of some tenant fixtures at the
Jones Creek location.  Transcript of March 31, 2008 trial, p. 85, ll. 17-24.  Talal insisted that the Jones
Creek store opened for a limited time, but his testimony on the point was inconsistent and not credible.  See
Transcript of Talal Solieman Video Deposition, p. 244, ll. 11-22 (first stating that the Jones Creek store
operated for three or four weeks and later testifying that it was for only a few days).

[39]   Louisiana Department of Revenue Office of Alcohol and Tobacco Control Tobacco Retail Certification
Permit, Exhibit Trustee 1-E.  The permit was renewed effective January 16, 2004 and expired on January
31, 2005.  Exhibit Trustee 1-G.

[40]   Transcript of April 28, 2008 trial, p. 504, ll. 18-24.  Gautreaux's listing of Discount's wholesale
purchases from January 2003 through February 2004 is page 4 of Exhibit Trustee 19-B.  Gautreaux
estimated that Discount sold 200 cartons of cigarettes per day based on the volume of cigarettes it had
purchased.

[41]   Talal had introduced himself as Sam Solomon to Agent Gautreaux for reasons that were not made part
of the record.

[42]   Transcript of April 28, 2008 trial, p. 502, ll. 13-17.

Talal testified that Discount did not maintain a running cash register tape reflecting its

sales.[43]  Talal also acknowledged that Discount's only record of income and expenses

(apart from suppliers' invoices) was a "notebook" he kept – actually a legal pad with his

handwritten notes – for which no backup existed.[44]  Talal recalled showing the notebook

to Discount's accountant, Pennywise Accounting & Tax Service, so that it could prepare

Discount's tax returns and financial statements, although he could not recall precisely

when he did.  He also remembered taking back the notebook but claimed that he had not

seen it since Sam Solomon's arrest.[45]  Pennywise's profit and loss statement for Discount,

which was based on the missing notebook, reflected that the company's net profit from

January 1, 2004 through February 19, 2004 was $13,410,[46] although Hassan Abouosayd,

who owns Pennywise, testified that this statement was not prepared until 2005 or 2006.

The irregular manner in which this document was prepared and the delay in its

preparation, as well as the absence from trial of the source business records, deprive it of

any evidentiary weight.

Despite the lack of business records, the trustee sought to prove Discount's lost

profits through the testimony of Ronald Cartier, C.P.A.  Mr. Cartier projected that

Discount's annual net income would have been $79,380,[47] conceding on cross-

---

[43]  Gautreaux asked Talal for the original sales documents from Discount's cash registers, known as "Z tapes," but never received them.

[44]  Transcript of Talal Solieman Video Deposition, p. 162, ll. 16-25, p. 163, ll. 1-6, p. 184. ll. 1-25, p. 185, ll. 1-9, p. 192, ll. 3-5.  Agent Gautreaux did review Talal's "notebook," characterizing it as "a few scribbles on a pad for sales."  Transcript of April 28, 2008 trial, p. 494, ll. 1-13.

[45]  Transcript of Talal Solieman Video Deposition, p. 194, ll. 2-25, p. 195, ll. 1-18, p. 197, ll. 1-14.

[46]  Exhibit Trustee 18-C.  Abouosayd also admitted that he had pled guilty to federal bribery charges, a felony, which casts doubt on his credibility.

[47]  Affidavit of Ronald D. Cartier, Exhibit Trustee 19-B.

examination that his estimate of lost income relied on financial data in Agent Gautreaux's

report because Discount maintained few business records.  He also relied on retail sales

information and models for businesses other than those selling tobacco products,

including beer, wine, other beverages, and food retailers.

Franklin countered with the expert testimony of Dr. Kenneth Boudreaux, a Tulane

University professor of economics and finance.[48]  Dr. Boudreaux opined that lack of

financial records barred any reliable estimate of Discount's lost profits.  Dr. Boudreaux

believed that the trustee's expert improperly relied on Agent Gautreaux's projection of the

volume and pricing of Discount's sales because he had not tested the validity of any of

Gautreaux's conclusions.  He also criticized Cartier's use of sales averages from industries

other that those identical to Discount's retail business, as well as his assumption that

Discount had, or would have had, average sales.

In summary, the plaintiff offered no documentary evidence such as cash register

tapes contemporaneously tracking sales to establish a reliable baseline of transactions

from which its sales – and hence its profits – reliably could be calculated.  Moreover, an

alternate (albeit possibly less credible) source of some of that information – the notebook

in which Talal claimed to have kept daily records – was never offered into evidence,

though Discount's bookkeeper, Pennywise, apparently used it to create a profit and loss

statement admitted into evidence as Exhibit Trustee 18-C.  Finally, Agent Gautreaux's

report was necessarily incomplete and may even have contained inaccurate estimates,

since it was based almost exclusively on wholesalers' invoices and not on Discount's

actual sales receipts.  In light of all this, expert opinion supporting the trustee's claim of

---

[48]  Boudreaux Report, Exhibit Defendant 10.

lost profits is speculative.  In contrast, Dr. Boudreaux's testimony was more persuasive and supports the conclusion that insufficient data rendered it impossible to determine Discount's projected profits.

        *ii.      The Trustee is Entitled to Recover Attorney Fees and Costs*

Even though the trustee has not proven that Discount lost any profits as a result of the seizure, he may recover general damages from Franklin comprising the attorney's fees and costs incurred to prosecute this lawsuit.

In *General Motors Acceptance Corp. v. Meyers*, 383 So.2d 245 (La. 1980), the Louisiana Supreme Court reversed the appellate court in part on the issue of whether attorney's fees are recoverable as *special damages*[49] for dissolution of wrongful seizure under executory process.[50] However, it noted that "the necessity for litigation is a relevant consideration in assessing *general damages*. . . .  [T]he trial court recognized the necessity of plaintiff obtaining counsel and engaging in judicial proceedings when making the award." *Meyers*, 385 So.2d at 247 (emphasis added).

On the trustee's motion, the court will hold an evidentiary hearing to determine the amount of fees and costs to which the trustee is entitled.[51]

---

[49]  "'Special damages are those which either must be specially pled or have a "ready market value," i.e., the amount of the damages supposedly can be determined with relative certainty. . .  On the other hand, '[g]eneral damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty.  These include pain and suffering[.]'"  *Wainwright v. Fontenot*, 774 So.2d 70, 74 (La. 2000), quoting Frank L. Maraist and Thomas C. Galligan, Jr., Louisiana Tort Law §7-2 (Michie 1996).

[50]  The court disapproved appellate rulings from several circuits that allowed recovery of attorney's fees for misuse of executory process.  *Meyers*, 385 So.2d at 247-8, citing *Escat v. National Bank of Commerce in New Orleans*, 284 So.2d 832 (La. App. 4th Cir. 1973); *General Investment, Inc. v. Gaudet*, 303 So.2d 624 (La. App. 4th Cir. 1974); *Walker v. J. J. Ellis Lake Providence Furniture Corp.*, 107 So.2d 550 (La. App. 2d Cir. 1958); and *Mid-State Homes, Inc. v. Bice*, 361 So.2d 275 (La. App. 1st Cir. 1978).

[51]  In Discount's bankruptcy, case 04-12903, the court has approved trustee's special counsel's fees and costs totaling $154,807.04, though not all of the amounts awarded were for services associated with this

*b.       Damages for Conversion*

"The traditional damages for conversion consist of the return of the property itself, or if the property cannot be returned, the value of the property at the time of the conversion."  *Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So.2d 758, 761 (La. 1985).

No party offered evidence regarding the cigarettes' value or their disposition once OATC seized them and returned them to Franklin.[52]  Therefore, Discount's recovery for the conversion is limited to its lost profits.  Because the trustee has not proven Discount's loss of profits, the trustee cannot recover damages for the conversion.

### Conclusion

Franklin is liable to Discount for wrongful seizure and conversion.  All other claims of the complaint will be dismissed.

On motion of the trustee, the court will hold a hearing to determine the appropriate attorney fees and costs to be awarded as wrongful seizure damages.

Baton Rouge, Louisiana, January 15, 2009.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE

---

adversary proceeding.  Order Granting First Application for Compensation (P-64); Order Granting Second Application for Compensation (P-153).

[52]   Although the Franklin invoices for the cigarettes delivered to Discount perhaps could establish the value of the converted property, Discount did not pay any of the invoices.